* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence and having reviewed the competent evidence of record, the Full Commission hereby modifies in part and affirms in part the Deputy Commissioner's Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Plaintiff's date of birth is April 6, 1948 and as of the date of hearing before the Deputy Commissioner, she was 56 years of age.
2. Defendant is Western Carolina Center and its adjusting agency is Key Risk Management Services.
3. Defendant regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
4. Plaintiff was employed with defendant-employer from approximately August 24, 1994 to approximately October 24, 2000.
5. An employer-employee relationship existed between defendant and plaintiff on or about April 14, 1999, and plaintiff was employed as a Supervisor/Trainer III.
6. On April 14, 1999, plaintiff sustained an admittedly compensable injury by accident to her right knee while in the course and scope of her employment with defendant, when she slipped in a wet spot and fell onto a floor. Defendant filed a Form 60 accepting plaintiff's claim on July 12, 2000.
7. At the time of the accident, plaintiff's average weekly wage was $466.97, which yields a compensation rate of $311.31 per week.
8. On or about January 9, 2001, Dr. David Cappiello stated that plaintiff was at maximum medical improvement and that she retained a 5% impairment to her right leg.
9. On or about August 20, 2001, plaintiff was seen by Dr. Michael Dockery for an independent medical examination and he stated that plaintiff was at maximum medical improvement and that she retained a 5% impairment to her right leg.
10. The parties stipulated to a packet of documents, which included plaintiff's medical records, vocational rehabilitation records, pleadings and tax records (Stipulated Exhibit 1). The following were also received into evidence:
 a. Plaintiff's Exhibit 1, a map of the Western Carolina Center campus;
 b. Plaintiff's Exhibit 2, a map of the greater Morganton, North Carolina, area;
 c. Plaintiff's Exhibit 3, a job description for a Trainer III;
 d. Plaintiff's Exhibit 4, a rejection letter dated June 28, 2000 for the Craft Village position;
 e. Plaintiff's Exhibit 5, a letter from Rehabilitation Consultant Cindy Keith of Carolina Case Management and Rehabilitation Services, Inc., dated March 14, 2000;
 f. Plaintiff's Exhibit 6, Western Carolina Center Secondary Employment Request and Approval Form;
 g. Defendant's Exhibit 1, a letter from Joyce Jensen to plaintiff dated January 17, 2001;
 h. Defendant's Exhibit 2, an abbreviated job description for a Trainer III.
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 51 years old at the time of her injury. Plaintiff received her GED and began her employment with defendant in August 1994 as a Trainer I.
2. Defendant is a residential treatment facility dedicated to providing quality care, treatment and training to the people who live there, most of whom are mentally retarded. In July 1998, plaintiff became a Supervisor/Trainer III and her job duties were mostly supervisory in nature. Plaintiff's work involved providing direct supervision of daily operations of one of the residential cottages to ensure safety and quality active treatment for the residents living there. Plaintiff was responsible for the safety of residents and staff as part of her job duties.
3. Beginning in February 1999, plaintiff developed hypertension linked to job stress. By March 25, 1999, plaintiff told her family doctor, Dr. Edward Bujold, that she had an "intolerable situation" at work, difficulty sleeping, was continually thinking about work, and had stress-related fatigue. Plaintiff did not file a claim for the contraction of a stress-related occupational disease.
4. In the early morning of April 14, 1999, plaintiff sustained an admittedly compensable injury to her right knee when she slipped on a wet spot and fell on the floor. Plaintiff experienced immediate right knee pain. Medical and compensation benefits were paid to plaintiff by the third-party administrator, Key Risk Management Services.
5. Plaintiff was treated conservatively for over one year, during which time she wore a splint and a brace to align her kneecap. While plaintiff received conservative care, she was placed under work restrictions of no lifting greater than five pounds, no bending from the lower back, alternating sitting, standing and walking as tolerated. Plaintiff's supervisors were aware of these restrictions and accommodated her position so that she did not work outside the restrictions at any time following her injury by accident. The accommodation required for her job was not significant. Plaintiff never complained that her restrictions were not being met or failed to perform her job in a satisfactory manner.
6. In August 1999, plaintiff again complained to Dr. Bujold of stress at work and informed him of high blood pressure readings taken at her place of employment. Based upon plaintiff's complaints, Dr. Bujold determined that plaintiff should be out of work for a period of time because she was experiencing so much stress. However, the first time Dr. Bujold's testing documented any hypertension was on November 10, 1999 when plaintiff had a mildly elevated blood pressure of 130/96. Dr. Bujold first prescribed Lotrel for plaintiff's hypertension on March 27, 2000.
7. On October 14, 1999, plaintiff was evaluated by Dr. Dustin Frazier, an orthopedist, who recommended that plaintiff should find other work more clerical in nature that would require less standing than her job with defendant.
8. Plaintiff continued to work for defendant and on February 7, 2000, requested and received defendant's permission to begin selling Aloette Cosmetics at home shows in her spare time. This effort by plaintiff to earn wages in cosmetic sales was not successful. Plaintiff also applied for a less physically demanding job at defendant's craft village in June 2000 but was not offered the job.
9. Plaintiff did not miss any time from work due to her knee until July 6, 2000, when she underwent arthroscopic surgery performed by Dr. David Cappiello, an orthopaedic surgeon at Blue Ridge Bone and Joint Clinic. Plaintiff's surgery was successful and resulted in a great deal of improvement to her right knee. Defendant paid temporary total disability compensation to plaintiff from July 6, 2000 until September 14, 2000.
10. Plaintiff returned to work on September 14, 2000 and worked until October 24, 2000. During this time, plaintiff had several meetings with Francine Hathaway and Joyce Jensen, her supervisors, and they discussed plaintiff's ability to perform her job and her general unhappiness with the stress of her job. Plaintiff stated there was nothing anyone could do to help her, because she was not sure the Trainer III job was one she wanted to continue.
11. On October 24, 2000, plaintiff presented to Dr. Bujold and requested that he put her on medical leave. She reported that her blood pressure was high when taken at work and she was not sure whether she wanted to continue to work. Plaintiff began a three-month FMLA leave beginning October 25, 2000. In early January 2001, Ms. Jensen contacted plaintiff and advised that her FMLA leave was about to expire and that several options were available.
12. Plaintiff verbally tendered a voluntary resignation to Ms. Jensen on January 16, 2001. Plaintiff felt that she was physically unable to perform her job duties that required her to bend, stoop, and kneel to help residents. Plaintiff explained at the Deputy Commissioner's hearing the reasons why she resigned:
 I resigned because of my blood pressure not being — I wasn't able to keep it within a range when I was at work. And then, there was the problem with my knee. . . . Well, when I had gone back to work after surgery, I — I mean, as far as he [Dr. Cappiello] was concerned, I was fine, but when I was at work, I was not fine — because my knee — it — there was swelling under the kneecap. I would just have pain in the leg. There were pain — I had pain in the area of my feet — in both feet and it was — it was just very hard to operate in the capacity that I needed to.
13. On January 9, 2001, although plaintiff was still wearing a brace, Dr. Cappiello released plaintiff at maximum medical improvement and assigned a 5% disability rating to her right leg, with no restrictions. On August 20, 2001, Dr. Michael Dockery, an orthopedic surgeon, conducted an independent medical evaluation, which also resulted in a 5% disability rating to plaintiff's right leg. Dr. Dockery also assigned permanent restrictions of limited stair climbing, squatting, bending, or stooping, based on plaintiff's symptoms. Since that time, plaintiff received additional treatment for her right knee injury from her family doctor, Dr. Bujold, and a chiropractor. As of the date of the Deputy Commissioner's hearing, plaintiff continued to experience stiffness in her right knee on an almost constant basis, weakness in her right leg, cramps in her feet and legs, and had trouble with stairs and inclines, as well as difficulty sleeping.
14. Plaintiff sought employment with other employers with no success. Defendant offered no vocational rehabilitation assistance. After she resigned from defendant in 2001, plaintiff continued to sell Aloette Cosmetics, earning lesser wages than her pre-injury wages. Beginning in late 2003, plaintiff also began working part-time at Merle Norman Cosmetics for eight hours a day, two to three days a week, earning $7.00 per hour.
15. Dr. Cappiello did not believe that there was any causal relationship between plaintiff's compensable knee injury and her blood pressure problems. Dr. Dockery stated that it was possible but not probable that the pain in plaintiff's knee significantly contributed to an elevation of plaintiff's blood pressure. Plaintiff's family physician, Dr. Bujold, felt that it was a "reasonable assumption" that the pain from the knee injury aggravated or accelerated plaintiff's stress and that plaintiff's removal from the stress associated with the Trainer III job, with its physical and emotional demands, contributed to or resulted in plaintiff's not having to be treated further for hypertension after she resigned from her job.
16. The Commission finds that the greater weight of the medical evidence fails to show that plaintiff's high blood pressure was related to, or exacerbated by, her right knee injury. The greater weight of the medical evidence also fails to show that plaintiff's complaints of heel, hip, and low back pain are related to her right knee injury.
17. Plaintiff's vocational expert, Henry Wong, Ph.D., has stated his opinion that plaintiff can return to work if her permanent restrictions are met. Although he doubted if suitable jobs were available near plaintiff's hometown of Morganton, Dr. Wong believed she could benefit from vocational rehabilitation efforts and was employable.
18. As the result of the compensable injury by accident, plaintiff was partially disabled from employment and earned reduced wages after her resignation on January 16, 2001. Her diminished ability to earn wages is due to her disability resulting from the compensable injury by accident.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On April 14, 1999, plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. As the result of her compensable injury by accident, plaintiff was partially disabled and is entitled to receive partial disability compensation at the rate of two-thirds of the difference between her average weekly wage and any wages earned beginning January 16, 2001 and continuing for 300 weeks from the April 14, 1999 date of injury or until plaintiff returns to work earning wages equal to her pre-injury wages. N.C. Gen. Stat. § 97-30; Larramore v. Richardson Sports Ltd. Partners,141 N.C. App. 250, 540 S.E.2d 768 (2000), aff'd per curiam, 353 N.C. 520,546 S.E.2d 87 (2001).
3. As the result of her compensable injury by accident, plaintiff retains a 5% permanent functional impairment of the right lower extremity for which she is entitled to compensation at the rate of $311.31 per week for 10 weeks. N.C. Gen. Stat. § 97-31(15).
4. Plaintiff is entitled to elect the more munificent remedy between N.C. Gen. Stat. §§ 97-30 and 97-31. McLean v. Eaton Corp.,125 N.C. App. 391, 481 S.E.2d 289 (1997).
5. Plaintiff is entitled to have defendant provide all medical treatment arising out of plaintiff's compensable injury to her right knee, to the extent it tends to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-25, 97-25.1. The approved medical expenses do not include treatment for plaintiff's hypertension or for heel, hip, or low back pain.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff partial disability compensation at the rate of two-thirds of the difference between her average weekly wage and any wages earned beginning January 16, 2001 and continuing for 300 weeks from the April 14, 1999 date of injury or until she returns to work earning her pre-injury wages. The portions of this amount which have accrued shall be paid in a lump sum, subject to the attorney's fee approved below
2. Defendant shall pay for any medical treatment related to plaintiff's compensable injury by accident, but not including treatment for plaintiff's hypertension or heel, hip or low back pain.
3. A reasonable attorney's fee of 25% of the compensation due under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel.
4. Defendant shall bear the costs due this Commission.
This 21st day of December, 2005.
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
 S/___________________ DIANNE C. SELLERS COMMISSIONER